12-1579-cv
Abrams v. National Westminster Bank

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

# SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 19th day of November, two thousand fourteen.

PRESENT: PIERRE N. LEVAL,
GERARD E. LYNCH,
CHRISTOPHER F. DRONEY,
*Circuit Judges.*

_____

ALLAN ABRAMS, IRAWADDY VENTURES, LLC,
ISABEL KNISPEL, LOIRE VENTURES, LLC, LOUISE
ABRAMS IRREVOCABLE TRUST DATED 4/2/70,
ORINORO VENTURES, LLC, TRUST FBO LOUISE
ABRAMS DATED 12/22/50, PARANA VENTURES, LLC,
TRUST FBO ROBERTA ABRAMS DATED 1/11/88,
YENGTZI VENTURES, LLC, TRUST FBO JOSHUA
ABRAMS DATED 1/11/88, YENIESI VENTURES, LLC,
TRUST FBO ROBERTA ABRAMS DATED 12/14/88,
ST. LAWRENCE VENTURES, LLC, TRUST FBO JOSHUA
ABRAMS DATED 12/14/88, ZAMIBEZZI VENTURES, LLC,
ROBERTA ABRAMS TRUST DATED 12/7/76,
WILLAMETTE VENTURES, LLC, JOSHUA ABRAMS
TRUST DATED12/7/76, INDUS VENTURES, LLC,
DAVID ABRAMS TRUST DATED 12/7/76, SENEGAL
VENTURES, LLC,

*Plaintiffs - Appellant*s,

v.                                                          No.    12-1579-cv

THE ROYAL BANK OF SCOTLAND GROUP PLC,
as a successor to National Westminster Bank, PLC,
*Defendant*,

NATIONAL WESTMINSTER BANK PLC,

*Defendant - Appellee*.

_____

FOR PLAINTIFFS-APPELLANTS:        BRIAN G. ISAACSON, Isaacson Law Firm, Seattle, Washington.

FOR DEFENDANT-APPELLEE:        HOWARD SCHIFFMAN, Schulte Roth & Zabel LLP, Washington, District of Columbia (Michael E. Swartz, Schulte Roth & Zabel LLP, New York, New York, of counsel).

Appeal from the United States District Court for the Southern District of New York (George B. Daniels, *Judge*).

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the order of the district court is AFFIRMED.

Plaintiffs-appellants appeal from the judgment of the district court granting a motion to dismiss their fraud, fraudulent concealment, and breach of fiduciary duty claims against defendant-appellee National Westminster Bank ("NatWest"). We assume the parties' familiarity with the underlying facts and procedural history of the case, which we recite only as necessary to explain our decision.

In November 1999, appellants engaged in a complex series of transactions as part of a tax shelter strategy, designed to generate paper losses, called a Bond Linked Issue Premium Structure ("BLIPS"). As part of this strategy, appellants formed limited liability corporations ("LLCs") that purported to borrow hundreds of millions of dollars from

NatWest at an above-market interest rate. Although the LLCs were purportedly investment vehicles, the terms of the loans insured that the loan proceeds were never at risk. The loans were then assigned to a "Strategic Investment Fund," a partnership between the LLCs and the tax shelter promoters. After a short period of time, through a series of further transactions, the LLCs withdrew from the partnership, the loans were unwound, and appellants were left to claim a massive loss based on the paper basis of their investment, despite the fact that the transaction was totally lacking in economic substance. Unsurprisingly, the IRS disallowed the claimed deductions, a Senate committee investigation resulted in a scathing denunciation of the BLIPS shelter, *see* Minority Staff of Perm. Subcomm. on Investigations, Senate Comm. on Governmental Affairs, 108th Cong., Rep. on U.S. Tax Shelter Industry: The Role of Accountants, Lawyers, and Financial Professionals (Comm. Print 2003) ("Senate Rep."), and the Justice Department criminally prosecuted many of the promoters of the shelter. In 2005, appellants brought an action against the promoters, accountants and lawyers who advised them on the shelter. They did not sue NatWest, however, until they brought the instant action on March 10, 2011, alleging that NatWest had never provided the loans that were the centerpiece of the shelter scheme, and had nevertheless wrongfully charged appellants $6,897,000 in loan fees.

NatWest argues, and the district court held, that appellants' claim was untimely under the governing statute of limitations, which neither party disputes is either six years from the date of the alleged fraud – a period long since expired by the time the suit was

filed – or two years from the time appellants "discovered the fraud, or could with reasonable diligence have discovered it."  N.Y. C.P.L.R. § 213(8); *see also id*. § 203(g). Appellants argue that their suit was timely because the limitations period did not begin to run until March 10, 2009 – the first full day after the transcript of the testimony of one Amir Makov, a government cooperator, was posted on the docket of the criminal case resulting from the shelter scheme, *United States v. Stein*, 05 Crim. 888 (S.D.N.Y. 2008). They assert that only from that testimony were they made aware of sufficient facts to pursue fraud claims against NatWest.

The district court correctly held that appellants' claims were untimely.  Appellants' purported date for the earliest time they could have known that NatWest was aware of the fraudulent nature of the tax shelter scheme is entirely artificial.  First, the Senate Report, issued in 2003, provided ample information to provide a good faith basis for a suit against NatWest.  The Report observed that the BLIPS scheme "could not have been executed without the active and willing participation of the . . . banks . . . that made these products work. . . . Major banks, such as Deutsche Bank, HVB, UBS, and NatWest, provided purported loans for tens of millions of dollars essential to the orchestrated transactions." Senate Rep. 9.  The Report made clear that the "purported loans" had no economic substance, because "the funds 'loaned' by the banks were never really put at risk." Senate Rep. 10.

Second, numerous other events clearly alerted appellants to the possibility that NatWest had participated in the shelter scheme knowingly, including: an IRS notice from

4

September 2000 warning taxpayers that the purported losses from BLIPS transactions were not allowable as deductions; a deferred prosecution agreement publicly reached with the government by another BLIPS lending bank in February 2006, in conjunction with which one of the bank's directors admitted that the loans were a "sham" and that the bank had not set aside any money to fund them; a class action suit brought in 2005 against some of the parties (though not the banks) involved in the transactions; and a number of newspaper articles throughout the period from 2003 on that referred to the BLIPS transactions as involving, among other things, "fake" loans.

Third, even if all of these events alerting appellants to potential fraudulent conduct by NatWest are disregarded, appellants' claim that the testimony of Makov was of central importance is unpersuasive. Appellants contend that Makov's testimony was critical because he stated that a NatWest officer was fully cognizant of the nature of the scheme, and that the premium loans in BLIPS transactions generally did not exist, because the banks would simultaneously enter into swap transactions that eliminated them. Transcript of Trial, *United States v. Stein*, 05 Crim. 888 (S.D.N.Y. 2008), at 3082, 3473-74. But Makov said little more than what the Senate committee and the press had been reporting for years, and he acknowledged that his testimony about the bank officer's state of mind was "speculat[ion]." *Id*. at 3473. Moreover, to the extent Makov's version of events could be argued to be of any significance, that version was publicly available well before the date conveniently chosen by appellants. As reported by the New York Times, Makov explained at his guilty plea proceeding in 2007 that the BLIPS transactions "had neither

5

real loans nor a real investment component." Specifically, Makov was quoted as saying that the transactions had "no economic substance" and only "the appearance of economic substance." Moreover, the trial testimony upon which appellants rely was given in a public courtroom in November 2008 – at a highly-publicized trial at which appellant Allan Abrams also testified. A diligent fraud victim, looking for evidence of scienter on the part of NatWest, had every incentive to monitor that trial. Appellants' claim that the limitations period should be measured from the first full day on which a written transcript of Makov's testimony was available on the court's docket is without merit. If Makov's testimony provided the theretofore missing pieces for appellants to sue NatWest, as they argue it did, appellants would have had to file suit no later than November 2010.

Appellants' suit was untimely under any plausible theory of when the statute of limitations began to run. We have considered appellants' remaining arguments and find them to be without merit. The order of the district court is therefore AFFIRMED.

FOR THE COURT:
CATHERINE O'HAGAN WOLFE, Clerk of Court